J-S85029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF B.C.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.C.B., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1387 WDA 2017 |

Appeal from the Order Entered August 18, 2017
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s):  37 of 2017

BEFORE:  BOWES, J., PANELLA, J., and STABILE, J.

MEMORANDUM BY PANELLA, J.                **FILED MARCH 06, 2018**

L.C.B. ("Father"), a registered sex offender, appeals from the orphans' court's order entered on August 18, 2017, which granted the petition filed by the Westmoreland County Children's Bureau ("WCCB") to involuntarily terminate his parental rights to his son, B.C.B. ("Child"), born in February 2016, pursuant to 23 Pa.C.S.A. § 2511(a)(5), (8), (11) and (b) of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[1] We affirm.

The orphans' court summarized the relevant factual and procedural history of this case as follows.

. . .

---

[1] By separate order, the orphans' court involuntarily terminated the parental rights of D.S. ("Mother"). Mother has not appealed the order terminating her parental rights, nor is she a party to this appeal.

6. The Child was removed from Mother and Father's custody on February 4, 2016, while the Child was still in the hospital following birth.

7. From the Child's birth in February 2016, until Father's incarceration in August 2016,[2] Father attended 37 out of 47 offered supervised visits, which were joint visits with Mother supervised by Amber Gordon of Project Star [ ]. [Ms. Gordon] also provided hands-on parenting and child development instruction to Mother and Father during visits.

8. As early as March 2016, when the Child was approximately one month[] old, the Child began crying on a regular basis during visits with Mother and Father. Mother and Father were unable to appropriately address and respond to the Child's distress by meeting the Child's needs or otherwise comforting the Child and, as a result, the Child's cries escalated to the point that the Child would choke on his own mucus. The Child's choking was life threatening and because Mother and Father failed to remedy the Child's distress, [Ms. Gordon] had to intervene to remove mucus from the Child's airways and then comfort the Child so he would stop crying. During a visit in April 2016, [Ms. Gordon] was able to calm and relax the Child after one of his fits of distress, however, the Child "instantly became upset" when returned to Father.

9. From March until his incarceration in August 2016, Father demonstrated little to no progress in his ability to independently identify and appropriately address and remedy the Child's fits of distress, which continued during visits on a regular basis. Father demonstrated no ability to comfort or soothe the Child out of his distress and he often lost his temper and became angry at the Child in response to the Child's continued crying.

_____

[2] Father was incarcerated in August 2016 relating to an incident where Father exposed himself to his eleven-year-old female neighbor and masturbated in front of her.

On January 31, 2017, Father pled guilty to corruption of minors and indecent exposure. *See* WCCB, Exhibit 2. Father was sentenced to eleven and one half to twenty-three months in prison, as well as five years of probation to be served consecutively. Father must register as a Tier I Megan's Law offender and is to "have no unsupervised contact with minors and no direct or indirect contact with the victim." N.T., 8/10/17, at 42.

10. [Ms. Gordon] testified that she was able to calm the Child down from his distress by talking and singing to the Child and by cuddling him. Both [Ms. Gordon] and the WCCB Caseworker, Emily Surace [ ], testified that they, and other members of each of their respective offices, were able to soothe and calm the Child when he was distressed. They further testified that the Child's severe adverse reaction to Mother and Father did not occur with anyone else they observed the Child with, whether that individual were known to the Child or a stranger.

11. Mother and Father never progressed beyond bottle-feeding the Child during supervised visits to practice spoon-feeding the Child, because the Child cried so much in Mother and Father's care during visits that feeding posed a significant choking risk to the Child.

. . .

13. Father has had no contact with the Child since his incarceration in August 2016, as Father has been placed in protective custody in the prison upon his request.

Orphans' Court Opinion, 10/17/2017, at 4-5.

On March 28, 2017, WCCB filed a petition to terminate Father's parental rights to Child.[3] On August 10, 2017, the orphans' court held a hearing on the petition. WCCB presented the testimony of Dr. Carol Patterson, a licensed psychologist who performed a parenting intellect and interaction assessment on Father; Dawna Miletics, Father's probation officer;  Amber Gordon, the visit supervisor with Project Star; and Emily Surace, the WCCB caseworker assigned to Father's case. Father did not present any evidence or testimony

---

[3] At the hearing, Child was represented by guardian *ad litem*, Emily Trisoline, Esquire, and by legal counsel, Ashley Lovelace, Esquire. Ms. Trisoline and Ms. Lovelace filed separate letters joining the WCCB's brief in support of termination.

at the hearing. Following the hearing, the orphans' court granted WCCB's petition and entered an order terminating Father's parental rights. Father filed a timely notice of appeal and concise statement of errors complained of pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

- 4 -

Here, the orphans' court terminated Father's parental rights pursuant to § 2511(a)(5), (8), (11), and (b). We "need only agree with [the orphans' court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (citation omitted). Father, a registered sex offender, correctly concedes WCCB presented clear and convincing evidence that his parental rights should be terminated pursuant to subsection (a)(11).[4] *See* Father's Brief, at 14 ("Regarding [subsection] (a)(11), it does appear that the current statutory scheme provides that Megan's Law Registration results in a per se ground for termination.")

Thus, we need only consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to § 2511(b), which provides as follows:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

---

[4] **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(11) The parent is required to register as a sexual offender under 42 Pa.C.S. Ch. 97 Subch. H (relating to registration of sexual offenders) or to register with a sexual offender registry in another jurisdiction or foreign country.

23 Pa.C.S.A. § 2511(a)(11).

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

The requisite analysis is as follows.

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations and quotation marks and citations omitted; brackets in original).

Regarding subsection (b), Father asserts that after his incarceration, he was "immediately and illegally deprived of any further visitation with the Child." Father's Brief, at 12. Father, however, does not support his assertion that he was "immediately and illegally" deprived of visits with any evidence,

legal argument, or citation to relevant legal authority. He simply says it. Therefore, Father has waived this issue. ***See***, ***e.g.***, ***In re W.H.***, 25 A.3d 330, 339 n.3 (Pa. Super. 2001) (stating issues are waived if appellate brief fails to provide meaningful discussion with citation to relevant authority). ***See also*** Pa.R.A.P. 2119(b).

Even if we had not found Father's issue waived, we would have concluded that his claim is without merit. The record does not support his bald assertion that the orphans' court abused its discretion in terminating his parental rights because the disruption in visits—due to his incarceration for exposing himself and masturbating in front of a child—halted the progress Father had begun to make with regard to his parenting skills.

Our review of the record reveals that Father did not file any motions or seek court-intervention to secure visitation with Child. Father did not attempt to make contact with Child, such as sending him cards, letters or gifts, and never contacted WCCB to set up visits with Child. Thus, had we reached the merits of this issue, we would have rejected Father's assertion that, upon his incarceration, he was deprived of visits with his son.

The orphans' court concluded that terminating Father's parental rights would best serve Child's needs and welfare and explained as follows.

> Throughout their visits with the Child, Mother and Father consistently demonstrated an inability to provide care to the Child to avoid the life-threatening escalation of the Child's fits of distress. The Child's fits were most acute and severe in Father's care, however, even after Father's incarceration, the Child's fits lessened in severity but nevertheless continued throughout

Mother's sole visits. The evidence and testimony at [t]rial clearly and convincingly showed that not merely does the Child have no bond with Mother or Father, but further, the Child is actually uniquely traumatized by contact with Mother and Father. And this trauma has not been observed in any of the Child's contact with anyone else, friend or stranger.

[Ms. Gordon] credibly testified that Father displayed nothing during visits that would indicate that he will be able to parent the Child. *Father has demonstrated absolutely no ability to care for the Child, or to interact appropriately with the Child*. While no medical testimony or evidence was presented that could explain the Child's fits, it is nonetheless clear that the Child's severe distress is caused by Mother and Father's presence, and that the fits are so severe in Father's presence that they are life-threatening. *The evidence and testimony presented at [t]rial clearly showed that Mother and Father have been unable to respond appropriately to their child's seemingly innate reaction to them, despite the persistent efforts of service providers to establish a bond between the Child and his parents*.

Orphans' Court Opinion, 10/17/2017, at 8-9 (emphasis added).

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.* 71 A.3d at 268 (citation omitted). The Court directed that, in weighing the bond considerations pursuant to subsection (b), "courts must keep the ticking clock of childhood ever in mind[,]" as "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*., at 269.

There is no evidence that a bond exists between Father and Child. Therefore, it was reasonable for the orphans' court to infer that none exists.

***See In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008). Ms. Gordon's testimony demonstrates that Child is in a pre-adoptive home, and that he views Foster Parents as his parents. ***See*** N.T., 8/10/2017, at 90-91. She explained that Child jumps into the arms of either Foster Mom or Foster Dad, and that Child is very happy and content in their care. ***See id***., at 93.

At the time of the termination hearing, Child had been in placement for over eighteen months and had resided with Foster Parents since shortly after his birth. Foster Parents are able to meet the developmental, physical and emotional needs of Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/2018

- 9 -